## Tom Driver v. The State.

*No. 1198. Decided February 10th, 1897.*

### 1. Murder—New Trial—Corrupt Juror.

On a trial for murder, where it was claimed, as a ground for new trial, that a corrupt juror, who had qualified on voir dire, but who was biased and prejudiced against defendant, sat upon the trial; and, in support of this ground, it was shown that the juror had stated that he was on the special venire in the case and, if he could get on the jury, "he would give him (defendant) what belonged to him," and, in his counter-affidavit, the juror stated that what he said and what he meant was that he would try defendant according to law, and give him what belonged to him; that he was unprejudiced in the case, and the verdict he had arrived at was simply his unbiased opinion from the evidence. Held: He was not disqualified on the ground of prejudice.

### 2. Same—New Trial—Verdict Decided by Lot.

On a trial for murder, where the jury agreed to ascertain the verdict, as to the penalty, by each juror setting down on paper the number of years he was in favor of giving the defendant in the penitentiary, and then add up the same, divide by twelve, and that the quotient should fix the number of years to be given the defendant in the penitentiary; and it was further agreed to be bound by and to abide this result, and the verdict returned was for the round number of years thus ascertained, leaving off the fraction of months over. Held: On motion for new trial, that the burden was upon the State to show that this agreement had been subsequently abandoned and that the verdict was not in conformity with the agreement, before it could be upheld as returned; and the fact that after the number of years of punishment had been thus ascertained, two of the jurors refused to abide the result, but, after several hours deliberation, did agree, and the same verdict was returned by all the jurors, there being no evidence that the original agreement had ever been abandoned, the verdict was contrary to law, and a new trial should have been granted.

**3.  Same—Suggestions to District Judges as to Verdicts by Lot.**

In view of the frequency with which verdicts are arrived at by lot, the district judges should instruct the jury as to the impropriety and illegality of such methods.

APPEAL from the District Court of Waller.   Tried below before Hon. T. S. REESE.

Appeal from a conviction for murder in the second degree; penalty, thirty-nine years' imprisonment in the penitentiary.

Appellant was indicted for the murder of Tom Mack, in Waller County, on the 7th of February, 1896, by shooting him with a gun.

The opinion states the material facts attendant upon the killing.

*R. E. Hannay* and *H. M. Browne*, for appellant.—A defendant in a criminal case is entitled to a trial by a fair and impartial jury of twelve legal and competent jurors, unbiased or unprejudiced against a defendant or his cause.

.  Juror Peter Maloney stated to C. A. Menke before the trial of this cause that he was on the special venire to try defendant Tom Driver in above cause, and that if he got on the jury he would give him (meaning defendant Tom Driver) just what belonged to him—meaning he would convict defendant.   Judging from what said Maloney said, the way he said it, and the way the conversation came up.   Washburn v. State, 31 Tex. Crim. Rep., 352.

The court erred in not setting aside the verdict of the jury, as asked for in defendant's motion for a new trial, for the reason that said verdict was arrived at by lot, to-wit: It was agreed by the jury, that each juror should write down his individual verdict of guilty, and the number of years of imprisonment, and the number of years thus wrote down by each juror, were added together and divided by twelve, and the quotient should be the verdict of the jury; and it was further agreed before the amount was ascertained that they would be bound by the result, and the jury were to abide by it.

A verdict in a criminal cause decided or arrived at by lot and agreed to-wit: That each individual juror should write down his individual verdict of guilty, is void.   Art. 817, Code Crim. Proc., 112; Wood v. State, 13 Tex. Crim. App., 135; Hunter v. State, 8 Tex. Crim. App., 75.

*Nat. P. Jackson* and *Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at thirty-nine years in the penitentiary, and prosecutes this appeal.   The record shows that the homicide occurred at Prairie View Normal School, in Waller County, situated five or six miles from Hempstead.   The defendant was the head cook at said institution, and the deceased, Tom Mack, was the steward.

Defendant had been to Hempstead on the day of the killing, and had ridden the horse of the deceased. He returned in the evening, and hitched the horse at the gate, and went in. The State introduced a number of witnesses, and their testimony tends to show that the killing was absolutely unprovoked on the part of the deceased. For a statement of the State's case, we refer to the testimony of the first witness, Delilah Humphreys—the testimony of the other witnesses substantially agreeing with hers. She testified, in effect, that, after the defendant hitched the horse and went into the inclosure and into the kitchen, the deceased took the horse defendant had ridden, carried him to the lot, and put him up. About this time defendant was seen with a Winchester gun, evidently in pursuit of one Henry Hamilton. Hamilton fled, and subsequently defendant presented his gun on one Flowers and told him he would shoot him. Witness, Delilah Humphreys, told him not to shoot, and defendant desisted, and he then started off towards the lot—evidently in a perturbed state of mind on some account, as he appeared to the witness to be crying. As he was going to the lot, Tom Mack, the deceased, turned the corner of the kitchen, coming from the office of one Anderson. Defendant turned to Mack and said: "You have treated me dirty, and I am going to kill you." Defendant presented his gun at deceased, who said: "I have done nothing to you. Don't fool with the gun. It might go off and hurt me." Defendant then shot Mack, the bullet entering his breast near the right nipple; and shot again, the second shot taking effect in deceased's thigh. At the first shot deceased threw his hand up to the wound in his breast and fell. About this time one Bartlett came running towards defendant, and defendant turned and fired at him. Defendant remained around the place for about a half hour after that, with his gun in his hand, and then got on a horse belonging to some one at the institution, and rode off; stating that the horse would be found at his father's, in Navasota. He went to Navasota, and the next day, or the day thereafter, he was arrested. The witness, Bartlett, testified that at the time he went towards the defendant, when he was shooting at deceased, he hallooed at him not to shoot; that deceased then turned and shot at him. This same witness testified that, when the parties first met, Mack was going around the corner, towards the kitchen, singing; that Driver threw his gun down on Mack and said, "You done me dirt," and Mack said, "Driver, what have I done to you? Don't fool with the gun." When Driver first called Mack, he said, "Mack, you black son-of-a-bitch, I am going to kill you." Mack turned as if to go into the kitchen. Driver said, "If you move, I'll kill you." Mack turned to Driver, motioning his open hands, and Driver shot him. Deceased made no motion as if to draw a weapon. When Driver shot, Mack threw his hand to his wound, and said, "You have hurt me." Driver shot again, and wheeled and shot at the witness. As stated before, the State introduced a number of witnesses, and their evidence is not materially different from the testimony of these two witnesses. One

Bookman testified for the defense substantially as follows: That he saw Tom Driver and the deceased out in the lot together. That witness was about fifty yards off. Saw defendant go back to the house, and in about five minutes heard shots in that direction. That he met defendant directly afterwards, and he told him that he had killed Mack; that he hated it, but had to do it to save himself. He told him he was going to Navasota or Hempstead, and give up. The defendent testified: That after he returned to the institution from Hempstead, and went into the kitchen, deceased took the horse to the lot. That he did not know when he took him, but he missed the horse and inquired for him, and went out and found deceased had taken him to the lot. That he asked him at the lot what he took him for, and deceased replied, "Because he was ridden half to death." Defendant told him that his horse had not been ridden hard, and the deceased then slapped him. Defendant asked him what he meant, and he replied that he meant what he said. Defendant told him he knew he could not fight him, as he had nothing to fight with. They then had some words, and defendant went back to the kitchen. Before he left, however, deceased told him that he had better be fixed; when he got his gun he was going to fix him for true. Defendant then went into the kitchen, and deceased came on behind him. When deceased came in the kitchen, defendant had the gun, which he was going to give to one Tolliver, who was then coming towards him. Deceased asked him what he was going to do with the gun. Defendant told him he was not going to do anything with it, more than give it to the owner, and deceased told him to put the gun up. Defendant said that he was not going to do it, on account of what deceased had said to him at the lot. Then deceased commenced disputing, and defendant asked him if he meant what he said when he was at the lot, and he replied, "Yes," and started towards the defendant, who told him to stop. Deceased then threw his right hand to his breast, and when he did so he (defendant) threw up his gun and shot him. That he shot him because he thought the deceased was going to shoot him (defendant). That he knew deceased had a pistol, and was in the habit of carrying it in the waistband of his pants, in front of his right side. That he threw his hand on his person where the handle of the pistol would be when he had it on. That he shot him before he had time to draw his pistol. That he did not see deceased's pistol, but believed he had one. That he (defendant) then went to Navasota, and sent for the sheriff, in order to surrender to him. That he subsequently surrendered to the city marshal, and gave up his gun. Defendant further stated that he shot deceased because he had threatened to kill him last January. This is a summary of all the testimony in the case. The court charged the jury on murder in the first degree, murder in the second degree, manslaughter, and self-defense. There is a general exception to the charge of the court, but we have examined the charge carefully, and in our opinion it is a correct charge, covering every phase of the case presented by the evidence. Appellant assigns as error the

action of the District Attorney in his closing argument to the jury, in which he stated that there had never been any trouble at the college, where this killing took place, until the defendant, Tom Driver, went there, on the ground that there was no evidence to authorize such a statement. The court, in explanation of this bill, states "that the District Attorney was promptly checked by the court, and the jury promptly instructed to disregard the statement." We see no harm accruing to the appellant in this matter. Appellant insists that he was prejudiced by the fact that one Peter Maloney sat as a juror in the case; that he was biased and prejudiced against the defendant, as he had formed and expressed an opinion as to his guilt before said case was called for trial, for he stated to one Charles Menke, or in his presence, that he wanted to sit as a juror in the case, and, if he did, that he would convict defendant; that, on his voir dire, said juror qualified himself, and appellant had no knowledge of his bias or prejudice. In support of this contention on his application for a new trial on this ground, appellant presented the affidavit of Menke, who stated that on the 12th of August, 1896, he heard Peter Maloney, one of the jurors in said case, say that he was on the special venire to try defendant, Tom Driver, and, if he could get on the jury, "he would give him what belonged to him" (meaning that he would convict defendant). "To judge from what Maloney said, and the way he said it, he produced the impression on me that he would convict defendant." In response to this the State presented the affidavit of Peter Maloney, substantially traversing the affidavit of Menke. He denied saying to him or to any one that, if he got on the jury, he would convict defendant; stated he would try the defendant according to law, and give him what belonged to him. That he was unprejudiced in the case, and that the verdict which he arrived at was simply his unbiased opinion from the evidence. It will be noted that in the affidavit presented by appellant the affiant only proposed to quote a part of the conversation he had with Maloney, to the effect "that he would give him what belonged to him," and the remainder of the said affidavit merely contained the impression or conclusion of said affiant, and was not a statement of anything in the language used by said juror. The language really used, as stated, does not of itself impute a bias or a prejudice on the part of said juror. This language is substantially admitted by the juror, but the inference or construction placed upon it by Menke is emphatically denied by the juror. This matter was tried by the court, and the judge held that the affidavits presented no such reasons as disqualified the juror on the ground of prejudice against defendant, and in this there was no error.

Appellant urgently contends that the verdict in this case was arrived at by lot, and that the court erred in not setting the same aside, and granting him a new trial, upon this ground. This matter was presented to the court below, and tried on affidavits. We quote from said affidavits such matter as is pertinent to a proper solution of this question. Appellant presented the affidavit of ten of the jurors, substantially stat-

ing as follows:   That said verdict of thirty-nine years was arrived at by the lot; that it was agreed that each juror should write down his individual verdict of guilty, and the number of years of imprisonment, and the number of years thus set down by each juror were to be added together and divided by twelve, and the quotient should be the verdict.   It was further agreed before the amount was ascertained that they would be bound by the result, and the jurors were to abide by it.   This affidavit was signed by H. A. Rankin, J. E. Middlebrook, S. D. Wood, Robtert C. Chatham, G. S. Burton, W. Britton, J. E. Ellis, Peter Maloney, and A. Cathcart.   Also the separate affidavit of H. W. Rankin, in effect as follows:   That, when the result of the addition and division was announced, the jurors E. Bade, and J. E. Ellis said that it was too much, and refused to agree; and it was then urged by some members of the jury that the agreement arrived at before the number of years was ascertained was binding, and it was to be the verdict of the jury, and the jury was bound by it, and should be bound by such agreement.   It was then that Bade and Ellis agreed to be so bound by their former agreement and abide by such agreement, and that there was no further agreement known to the affiant.   In reply the State introduced the affidavits of A. Cathcart, Peter Maloney, L. D. Wood, George Burton, J. E. Ellis and Robert C. Chatham, to the effect that after the agreement, and they had divided the number of years and reached the quotient, one of the jurors disagreed, and then the jury deliberated and counseled about the case, and finally agreed after much deliberation, that they would assess the punishment at thirty-nine years. Bade did not and would not stand on the agreement as made before the addition of the number of years, etc., but finally agreed to return a verdict of thirty-nine years, as heretofore agreed upon, and all agreed to it; and the verdict was not the result of the first agreement, because Bade would not abide by his agreement, and the verdict was a fair expression of the jury, and was arrived at after due deliberation.   The affidavit of Edward Bade shows that he did agree to stand by the verdict arrived at by each man, saying how many years he would agree to, and divide the whole by twelve, and that should be the verdict; that, after the jury deliberated and consulted about the case, he finally agreed to a verdict of thirty-nine years' imprisonment; and that said verdict is and was his verdict, and is a fair expression of his opinion of the case. Also, the affidavit of J. E. Ellis, who stated that he did not and would not stand by the result arrived at when the average was made by dividing the number of years by twelve, but that he afterwards did agree to the verdict rendered into court; and it was his verdict, and a free expression of the jury after the average was made.   He says that the average was thirty-nine years and nine months, and that the verdict was reached after the first disagreement, and after they had consulted some eight hours longer.   Also, the affidavit of R. C. Chatham, who says that, when the average was made by dividing each number of years set down by the jurors, the result was not thirty-nine years, but figured

out something over thirty-nine years, and that E. Bade and J. E. Ellis,. who were on the jury, would not agree, and it was some hours afterwards that the jury finally agreed, and did render the verdict of thirty-nine years, which was a fair expression of one and all of the jurors. The issue thus made by the affidavits was presented to the judge, and tried by him. Our statute provides (Art. 817, Subdiv. 3, Code Crim. Proc.) that a new trial shall be granted where the verdict has been decided by lot. A number of decisions emphasize this rule, and wherever the record shows that a jury has decided a case by lot, where a new trial was refused in the court below, this court has reversed the judgment. See Leverett v. State, 3 Tex. Crim. App., 213; Hunter v. State, 8 Tex. Crim. App., 75. And for other cases see, Willson's New Crim. Proc., note 3 to Art. 817. However, it has been held that, although the jury may resort to lottery to ascertain the number of years they will impose as a punishment, yet, if they are not bound by this agreement, it will afford no cause as a ground for a new trial. See, Pruitt v. State, 30 Tex. Crim. App., 156, and Barton v. State, 34 Tex. Crim. Rep., 613. In this case there was unquestionably an agreement to decide the number of years they would impose as a punishment by lottery, and, after this was ascertained, to abide by said agreement. This is proved by the affidavits of a number of jurors, and not gainsaid by any. Some of the jurors stated that, after the verdict was ascertained by lottery, two of the jurors disregarded it, and stated that they would not be bound by it. After this some discussion ensued, and the jurors remained out some hours thereafter before returning a verdict. The verdict returned by them, according to some of the jurors, was the same number of years as ascertained by the lottery. By two of the jurors it is stated that it was some nine months less than that arrived at by lot, but it is not shown whether this fraction of nine months was dropped immediately at the time the verdict was reached by lot, or was dropped some time thereafter. As to this fraction of nine months, however, in this number of years, we regard it as immaterial. As was said in Dunn v. Hall, 8 Blackf., 31, "In the absence of proof showing how the fraction came to be omitted, we should regard the same, in itself, too trivial to indicate any departure from the principle by which the jury had agreed to determine the amount of damages." Also, in Williams v. State, 15 Lea, 129, there was a difference of three months between the quotient arrived at by lot and that finally agreed on by the jury. The court regarded this as immaterial; that is, not as evidence that the jury had abandoned the verdict ascertained and agreed upon by them by lot. As above stated, such an agreement having been entered into by the jurors, the burden was upon the State to clearly and unquestionably show that this agreement was abandoned before the verdict was reached. This was not done in this case. It is true that by affidavit it appears that two of the jurors refused to abide by the result reached, and the jury remained out, considering the case, for some hours thereafter. These affidavits are not explicit. The jury may have been engaged in an effort to induce

the two jurors who refused to agree to abide by the agreement.  In fact, this is indicated by the affidavit of Rankin, the foreman of the jury; and these two jurors did finally agree to the verdict, which was thirty-nine years.  Now, if there was an abandonment of the original agreement, it was a very easy matter to be shown by controverting affidavits. It is stated in some of the affidavits that they were considering the case —deliberating upon it; but no affidavit states that there was an abandonment of the agreement, except as to two, who finally agreed and consented to the verdict reached by lot.  We wish to state this proposition: that where such an agreement is made the burden is upon the party in whose favor the verdict is rendered to show an abandonment of the agreement.  We hold that this was not done in this case.  We are of opinion that a new trial should have been granted upon this ground; and we furthermore suggest that, inasmuch as it is not of infrequent occurrence that cases come before this court in which it appears that the verdict of the jury has been arrived at by lot, the district judges should instruct the jury as to the impropriety of this manner of arriving at their verdicts.  We would impress upon the trial judges the provisions of Art. 817, Code Crim. Proc., which reads as follows: "New trials in cases of felony shall be granted for the following reasons: * * * (3) Where the verdict has been decided by lot, or in any other manner than by a fair expression of opinion by the jurors."  We are of opinion that this was not a verdict reached as the law requires, and that a new trial should have been granted.  The judgment is reversed and the cause remanded.

*Reversed and Remanded.*